**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**STEVEN D. OVERS,**
          **Plaintiff,**

**-vs-**                                    **Case No. 6:11-cv-217-Orl-28DAB**

**GENERAL DYNAMICS INFORMATION TECHNOLOGY,**
          **Defendant.**

## ORDER

Plaintiff brings this employment discrimination action against General Dynamics Information Technology ("GDIT"), alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). Specifically, Plaintiff, who is African-American, alleges that he was denied training and promotional opportunities and was subjected to unfair work practices. GDIT has moved for summary judgment,[1] and as discussed below, GDIT's motion shall be granted.

**I. Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However,

---

[1] The relevant filings include: GDIT's Motion for Summary Judgment (Doc. 22), Plaintiff's Response (Doc. 23), and GDIT's Reply (Doc. 26). Plaintiff also re-filed his Response as an attachment to Doc. 25, but it appears to be the same as Doc. 23.

when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so onesided that one party must prevail as a matter of law.'" Sawyer, 243 F. Supp. 2d at 1263 (quoting Anderson, 477 U.S. at 251-52).

## II. Background

Plaintiff was first hired by GDIT's predecessor company, Anteon Corporation, in 2005, (Offer Letter, Ex. 4 to Overs Dep., Doc. 22-1), and then became an employee of GDIT when it acquired Anteon in 2006, (Overs Dep., Doc. 22-1, at 85). Outside of a single racial joke, (id. at 104), Plaintiff does not allege that any discriminatory acts occurred until 2008.

In June 2008, Plaintiff was moved from the business development department to the

facilities department, (id. at 121), and requested the title of Facilities Supervisor.[2] (Id. at 125-26; Gaines Decl., Doc. 22-2, ¶ 4). Plaintiff's request was referred to Justin Gaines,[3] who worked in the compensation department in Washington, D.C. ( Overs Dep. at 127; Gaines Decl. ¶ 4). After reviewing Plaintiff's job duties, Gaines denied Plaintiff's request because his job duties did not include supervision, which was a requirement for the supervisor title. (Gaines Decl. ¶ 5). Plaintiff did not think that Gaines's decision was racially motivated, (Overs Dep. at 127), and indeed, Gaines was not aware of Plaintiff's race when he made the determination, (Gaines Decl. ¶ 9). Ultimately, Plaintiff was given a different title that was in a higher pay grade than the Facilities Supervisor position. (Id. ¶ 5).

Later in 2008, on the day after Barack Obama was elected president, Plaintiff brought his Obama "rally towel" in to work and put it up on his wall. (Overs Dep. at 152, 154). His supervisor at the time asked Plaintiff to take the towel down, stating that it was disrespectful to the current president; supporters of candidate John McCain, however, had been handing out stickers and pins prior to the election. (Id. at 151-53). After President Obama was inaugurated, Plaintiff was allowed to rehang his towel. (Id. at 154).

Thereafter, in 2009 Plaintiff was denied two training opportunities. The first opportunity was a series of informal Program Manager ("PM") Training sessions held onsite during the lunch hour in October 2009. (Overs Dep. at 236). Sherri Chancellor–who was

---

[2] Plaintiff's previous title was Senior Logistics Engineer. (Overs Dep. at 120; Gaines Decl. ¶ 4).

[3] Although Gaines is referred to as "Justin Gatlin" during much of Plaintiff's deposition, the parties later clarify that they meant Gaines. (Overs Dep. at 303).

not Plaintiff's direct supervisor at the time, but who interacted with him on a regular basis–sent out a notice inviting certain employees to this training, (id. at 244; Chancellor Dep., Doc. 22-3, ¶ 4); Plaintiff was not specifically invited because, at the time, Chancellor was not aware of Plaintiff's interest. (Chancellor Dep. ¶ 4). The training was, however, announced at a weekly staff meeting that Plaintiff attended. (Chancellor Decl. ¶ 4; Overs Dep. at 247). After the first session, Chancellor learned of Plaintiff's interest in the PM training and invited him to the subsequent sessions. (Chancellor Decl. ¶ 6; Overs Dep. at 254-55). One of Plaintiff's co-workers, Barbara Buzzard, was at the first PM training session, but she was in attendance because it was part of her job duties to set up for the training and clean up afterwards; she was not invited to attend for training purposes. (Chancellor Decl. ¶ 5).

The second training opportunity that Plaintiff was not able to attend was an offsite "Frontline Supervisor Training" that took place in December 2009. (Id. ¶ 7; Overs Dep. at 234). Peggy Waters–who was not Plaintiff's supervisor–sent out a mass email about the training. (Overs Dep. at 234). Plaintiff was interested in the training and asked Chancellor–who by then had become his supervisor–for permission to attend. (Overs Dep. at 234-35; Chancellor Decl. ¶ 7). Chancellor denied Plaintiff's request to attend, however, because the training was for managers only, and Plaintiff was still not a manager. (Chancellor Decl. ¶ 7; Overs Dep. at 235).

Also in 2009, Dennis Schoeppner became Plaintiff's supervisor and shortly thereafter called Plaintiff in for a meeting to discuss two complaints that Schoeppner had received about Plaintiff. The first complaint was that Plaintiff had been playing dominos outside on

the picnic tables during work hours. (Overs Dep. at 190). Schoeppner told Plaintiff that this did not reflect well on Plaintiff, particularly in light of the fact that the company was undergoing layoffs at the time. (Id. at 190-91). Plaintiff does not dispute that he had been playing dominos outside of his lunch hour and does not object to the content of the discussion, but he does state that he felt that Shoeppner's tone and manner of delivery was disrespectful. (Id.). At the same meeting, Shoeppner told Plaintiff that there had been complaints that other employees were having difficulty reaching Plaintiff on his cell phone. (Id. at 192). Again, Plaintiff does not take issue with what Schoeppner said–only the manner in which he said it. (Id. at 194).

Neither of these issues resulted in any formal disciplinary action, (Brayman Decl. ¶ 7; Chancellor Decl. ¶ 11); however, Schoeppner may have made some sort of informal documentation of the meeting, (Overs Dep. at 203-04). Plaintiff also believes that this meeting resulted in a lower performance evaluation for 2009 than he would have otherwise received. (Id. at 205). For Plaintiff's 2009 yearly review, he received an overall score of 4.4 out of 5. (2009 Performance Review, Ex. 11 to Overs Dep., at 117).[4] Although this score constituted an "exceeds expectations" rating, (id.), Plaintiff felt that he deserved an overall score of 4.8, (Overs Dep. at 221-22). Nevertheless, based on the 4.4 score Plaintiff received the highest pay raise available for that year, and a higher score would not have entitled Plaintiff to any additional compensation or benefits. (Chancellor Decl. ¶ 8).

In 2010, David Santos–the lone employee in the shipping and receiving

---

[4] Page citations to the 2009 Performance Review are to the electronic filing page number because the document does not contain page numbers.

department–was laid off, and Plaintiff and Buzzard were asked to absorb Santos's duties.[5] (Overs Dep. at 270). Plaintiff requested extra compensation for doing so, and his request triggered a review of both his and Buzzard's compensation. (Id.; Gaines Decl. ¶ 7). Gaines was again tasked with the review. (Gaines Decl. ¶ 7). Ultimately, Gaines determined that both Plaintiff and Buzzard should be moved to the position of Senior Business Administrator, which was an EO4 pay grade. (Id.). The position that Plaintiff was in at the time, however, was an EO5 pay grade, and moving to the Senior Business Administrator position would, therefore, result in a pay cut for Plaintiff. (Overs Dep. at 285). So that Plaintiff's salary would not be reduced, he was allowed to remain in the position he already held; Plaintiff was not given a pay raise. (Id.; Gaines Decl. ¶ 8). Buzzard, on the other hand, was in a lower pay grade, and her salary was increased from $53,885 to $60,000–still approximately $11,500 less than Plaintiff's salary. (Gaines Decl. ¶ 8).

Finally, Plaintiff asserts that he was denied two promotions due to his race. The first promotion was a PM position formerly held by William Hutchings. Hutchings was laid off in February 2011, and Mitch Feroglia took over many of Hutchings's duties. (Brayman Decl. ¶ 4; Overs Dep. at 259). Prior to taking over these duties, Feroglia was already in a PM position and Plaintiff was not.[6] (Brayman Decl. ¶ 3). Feroglia did not receive any additional

---

[5] Plaintiff had been back-filling for Santos since April 2009, when the other two shipping and receiving employees were laid off. (Overs Dep. at 169). Although he asked for extra compensation at the time, Plaintiff concedes that such compensation was unwarranted. (Id. at 181).

[6] When Feroglia's PM position was announced, Plaintiff did not apply for it. (Brayman Decl. ¶ 3).

pay and was not promoted or reclassified based on absorbing Hutchings's duties. (Id. ¶ 4). Also in 2011, Plaintiff requested a promotion to Principal Business Administrator. (Chancellor Decl. ¶ 10; Overs Dep. at 288). This request was denied, however, because Gaines had already determined that the appropriate position for Plaintiff in the Business Administration sub-family was Senior Business Administrator. (Chancellor Decl. ¶ 10). Overs also did not meet the requirements of a "principal" position because he was not tasked with providing guidance or supervision to administrative staff. (Id.).

## III. Discussion

As an initial matter, GDIT asserts that some of Plaintiffs claims are barred because Plaintiff failed to exhaust his administrative remedies as to those claims. GDIT also asserts that Plaintiff has failed to make out a prima facie case for any of his claims and that GDIT has offered a legitimate, non-discriminatory reason for its actions that are not pretextual.

### A. Exhaustion of Administrative Remedies

"No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge." Alexander v. Fulton Cnty., Ga., 207 F.3d 1303, 1332 (11th Cir. 2000) overruled on other grounds by Manders v. Lee, 388 F.3d 1304 (11th Cir. 2003). GDIT asserts that all of Plaintiff's claims arising prior to February 12, 2009 are barred because a charge addressing those claims was not timely filed with the EEOC. GDIT also asserts that several other claims are barred because Plaintiff did not include them in his EEOC charge.

"Before a potential plaintiff may sue for discrimination under Title VII, []he must first exhaust [his] administrative remedies. The first step down this path is filing a timely charge

of discrimination with the EEOC." Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001) (citations omitted). In a deferral state such as Florida, a plaintiff must file a charge "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Plaintiff's EEOC charge was filed on December 9, 2009, (Charge of Discrimination, Ex. 1 to Overs Dep.), and Plaintiff concedes that all claims arising prior to February 12, 2009 are time-barred, (Pl.'s Resp., Doc. 23, at 3; Joint Pretrial Statement, Doc. 30, at 11). All allegations of discrimination occurring prior to that date–including the denial of the Facilities Supervisor title and the incident regarding Plaintiff's Obama rally towel–are therefore time-barred.

In addition, "'the scope of [a] judicial complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" Francois v. Miami Dade Cnty., Port of Miami, 432 F. App'x 819, 821 (11th Cir. 2011) (quoting Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir.1970)). "[J]udicial claims are allowed if they 'amplify, clarify, or more clearly focus' the allegations in the EEOC complaint, but . . . allegations of new acts of discrimination are inappropriate." Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1279-80 (11th Cir. 2004) (quoting Wu v. Thomas, 863 F.2d 1543, 1547 (11th Cir.1989)). The Eleventh Circuit, however, has noted that courts should be "extremely reluctant to allow procedural technicalities to bar claims brought under Title VII," and therefore, "the scope of an EEOC complaint should not be strictly interpreted." Id. at 1280.

Plaintiff's EEOC charge states as follows:

I. I believe the above named Respondent discriminated against me because

-8-

of my race/Black.

II. I have been employed by the Respondent since October 3, 2005, as a Research and Development Analyst[.]

III. My present position is a Senior Specialist, Facilities. On or about September 30, 2009, I spoke with VP Larry Retta regarding training for the Program Manager's (PM) position. He thought it was [a] good idea and he said he would see what he could do. On October 1, 2009, I was covering for another department when I noticed several people in the large conference room having a meeting. I asked what was going on and was told that they were giving the PM training to anybody that wanted to attend. Apparently, an email went out to the managers informing them of the training and to let their employees know if they want to attend. I was never informed of the training, although my supervisor was well aware of [my] interest[]. There were no Black employees in the training; therefore, I believe that I [was] not provided with the same promotional opportunities as my similar[ly] situated counterpart. I complained to HR about the racial discrimination, sexual harassment[7] and unfair work pract

[IV.] The Respondent discriminated against [me] in violation of . . . Title VII of the Civil Rights Act[] of 1964, as amended, by [denying me] training.

(EEOC Charge of Discrimination, Ex. 1 to Overs Dep.). In addition, Plaintiff indicated August 31, 2009 as the earliest date of discrimination and October 2, 2009 as the latest date of discrimination. (Id.). Plaintiff did not check the box indicating that this was a "continuing action." (Id.).

GDIT asserts that the claims surrounding the meeting with Schoeppner, the 2009 performance evaluation, and the denial of extra compensation for taking on additional duties are not properly before the Court because they were not contained in the EEOC charge and do not amplify, clarify, or more clearly focus Plaintiff's claims therein, nor would these claims

---

[7] Plaintiff does not make any factual allegations regarding sexual harassment in his EEOC charge, his Complaint, or his deposition, nor did Plaintiff check the box on the EEOC charge indicating that the alleged discrimination was based on sex. It appears that Plaintiff erroneously included "sexual harassment" in his EEOC narrative.

-9-

have been reasonably expected to be a part of the EEOC investigation. Plaintiff does not address these arguments in his Response; while this failure to respond is sufficient to grant GDIT's motion, the Court will, nevertheless, address the merits of GDIT's argument.

Plaintiff's EEOC charge does not even remotely reference Plaintiff's meeting with Schoeppner, any performance evaluations, or denial of compensation for additional duties. Furthermore, at least two of these events–the performance evaluations and the denial of compensation–occurred outside of the time frame indicated in the EEOC charge.[8] Plaintiff's EEOC charge clearly focuses on the failure-to-train claims and even liberally construing the charge, the only other claims that are at all related to the failure-to-train claims are Plaintiff's denial-of-promotion claims; Plaintiff alleges that he was denied these promotions as a result of not receiving training opportunities.

The purpose of limiting the scope of Plaintiff's claims to those asserted in the EEOC charge is "that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." Gregory, 355 F.3d at 1279 (quotation omitted). Addressing Plaintiff's claims other than his failure to train and failure to promote claims would thwart this purpose.

Accordingly, the claims surrounding the Schoeppner meeting, the performance evaluation, and the denial of compensation for extra duties were not contained in and do not

---

[8] GDIT asserts that the Schoeppner meeting occurred on August 28, 2009, which would also be outside of the EEOC charge time frame, but GDIT has not cited, and the Court cannot locate, any evidence that this date is correct.

-10-

amplify, clarify, or more clearly focus Plaintiff's claims. Plaintiff has failed to exhaust his administrative remedies as to those claims, and those claims are, therefore, not properly before the Court.

### B. Failure to Train and Failure to Promote

Title VII provides in part that an employer may not discriminate against an employee because of that employee's race. 42 U.S.C. § 2000e-2(a)(1). "On any Title VII claim the plaintiff bears 'the ultimate burden of proving discriminatory treatment by a preponderance of the evidence.'" Crawford v. Carroll, 529 F.3d 961, 975 (11th Cir. 2008) (citing Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990)). Because Plaintiff has not presented any direct evidence of discrimination, the Court evaluates his claim using the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny to determine if Plaintiff can establish his claim through circumstantial evidence. See, e.g., EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000) ("Disparate treatment claims require proof of discriminatory intent either through direct or circumstantial evidence. . . . Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar McDonnell Douglas paradigm for circumstantial evidence claims.").

Under this three-part framework, the plaintiff in a disparate treatment case has the initial burden to establish a prima facie case of discrimination by a preponderance of the evidence. McDonnell Douglas, 411 U.S. at 802. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff

establishes a prima facie case, a presumption of discrimination arises. See, e.g., Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

Case law has produced many different articulations of the elements of a Title VII plaintiff's prima facie case. The elements are to be flexibly rather than rigidly applied, and the formulations of these elements depend on the type of case and the pertinent facts. See, e.g., Carter v. City of Miami, 870 F.2d 578, 582 & 583 nn.12 & 14 (11th Cir. 1989) (noting variation in prima facie elements and that "[t]he Supreme Court has stressed that the *McDonnell* test was not intended to be a rigid or ritualistic test of disparate treatment"). Generally, "[t]o make out a prima facie case of racial discrimination a plaintiff must show (1) []he belongs to a protected class; (2) []he was qualified to do the job; (3) []he was subjected to adverse employment action; and (4) [his] employer treated similarly situated employees outside [his] class more favorably." Crawford, 529 F.3d at 970.

If the plaintiff presents a prima facie case and its attendant presumption attaches, the burden "[s]hifts to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. McDonnell Douglas, 411 U.S. at 802. The employer's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves, 530 U.S. at 142 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)). "If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Chapman, 229 F.3d at 1024 (quoting Combs v.

Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).

### 1. Frontline Supervisor Training

Plaintiff alleges that he was discriminated against by not being allowed to attend the Frontline Supervisor Training in December 2009. Defendant, on the other hand, asserts that Plaintiff has not established a prima facie case for discrimination regarding the Frontline training because Plaintiff cannot show that GDIT treated any similarly situated employee outside of his protected class more favorably. GDIT's argument is well-taken.

Plaintiff does not even assert that a similarly situated employee was allowed to attend the Frontline training. Additionally, the evidence reflects that no other employee at the Orlando GDIT facility had attended the training when Plaintiff requested to do so, (Chancellor Dep. ¶ 7), and Plaintiff has failed to present any evidence that any employee attended after Plaintiff's request. Moreover, even if Plaintiff had established a prima facie case, GDIT asserts a legitimate, non-discriminatory reason for denying Plaintiff's request–the Frontline training was only for managers, and Plaintiff was not a manager. (Id.). Plaintiff has presented no evidence indicating that this reason is mere pretext.

### 2. Informal PM Training

GDIT argues that Plaintiff has failed to establish a prima facie case of discrimination regarding the informal PM training because he cannot establish any adverse employment action, nor can he establish that any similarly situated employee outside of his protected class was invited to attend this training. Plaintiff asserts that he established an adverse employment action because he would have received a promotion to the PM position left vacant when another employee, Hutchings, was laid off if he had received the PM training.

In addition, Plaintiff asserts that Buzzard was a similarly situated employee who was invited to attend the PM training.

Assuming that these allegations satisfy the prima facie case, Plaintiff's claim still fails because GDIT has provided a legitimate, non-discriminatory reason for its actions–Plaintiff was not invited to the first PM training session because Chancellor, who was in charge of the training, was not aware of Plaintiff's interest. Plaintiff asserts that Chancellor must have known of his interest because "everybody [knew] how bad [he] wanted that training" and he "didn't hide it from anybody." (Overs Dep. at 254). Plaintiff's speculation, however, is insufficient to overcome the evidence that Chancellor did not know of his interest, (Chancellor Dep. ¶ 4), that Plaintiff was invited to all subsequent training sessions once Chancellor became aware of Plaintiff's interest, (id. ¶ 6; Overs Dep. at 254-55), and that even though Plaintiff was not individually invited to the training, the training was announced at a staff meeting that Plaintiff attended, (Overs Dep. at 247; Chancellor Decl. ¶ 4).

Moreover, "[t]he denial of training, without more, does not constitute an adverse employment action." Fitzhugh v. Topetzes, No. 1:04-CV-3258-RWS, 2006 WL 2557921, at *7 (N.D. Ga. Sept.1, 2006) (citing cases). Thus, Plaintiff must establish some other adverse employment action that resulted from the failure to train. The only adverse employment action Plaintiff asserts in connection with the PM training is that he was denied a promotion to the PM position left vacant when Hutchings was laid off. As discussed in the next section, however, no such position existed, and even if it did Plaintiff would not have been qualified for the position even if he had attended the informal PM training session.

### 3. Failure to Promote

Plaintiff asserts that he was discriminatorily denied two promotions–one to the PM position vacated by Hutchings and one to a Principal Business Administrator position. To establish a prima facie case of failure to promote, a plaintiff "must show that (1) he is a member of a protected class; (2) he was qualified and applied for the promotion; (3) he was rejected despite his qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted." Jerome v. Marriot Residence Inn Barcelo Crestline/AIG, 211 F. App'x 844, 847 (11th Cir. 2006) (citing Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004)).

Plaintiff has not presented evidence that he applied for Hutchings's PM position or that another employee outside of Plaintiff's protected class was promoted to that position; such a position did not exist. Plaintiff asserts that another employee, Mitch Feroglia, was promoted to Hutchings's PM position. The record evidence, however, reflects that Hutchings's position was not filled–instead, Feroglia was assigned to absorb part of Hutchings's duties without any additional compensation or change in job title. (Brayman Decl. ¶ 4). Additionally, the evidence establishes that even if Plaintiff had attended the PM training, he would not have been qualified for Hutchings's position because he did not have the requisite finance and contracts experience. (Brayman Decl. ¶ 6). Plaintiff has presented no evidence to show that he was qualified or that he would have been qualified if he had received the PM training.

Finally, Plaintiff asserts that he was denied a promotion to a Principal Business Administrator position. Plaintiff presents no evidence that such a position was open, though

the evidence does reflect that he requested a promotion to such a position.[9] GDIT has again presented a legitimate, non-discriminatory reason for not promoting Plaintiff to this position–Plaintiff did not meet the requirements for this position because he was not tasked by his supervisor with providing guidance to administrative staff. (Chancellor Decl. ¶ 10). In addition, it had already been determined by Gaines, who did not know of Plaintiff's race at the time, that the appropriate position for Plaintiff in the Business Administration sub-family was Senior Business Administrator–not Principal Business Administrator. (Id.; Gaines Decl. ¶ 7). Plaintiff has presented no evidence to show that GDIT's reasons were pretextual. Accordingly, Plaintiff has failed to establish that he was subjected to any adverse employment action due to his race.

## IV. Conclusion

In accordance with the foregoing, GDIT's Motion for Summary Judgment (Doc. 22) is **GRANTED**. The Clerk shall enter a judgment providing that Plaintiff takes nothing on his claims and close this case thereafter.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 21st day of May, 2012.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

---

[9] GDIT classifies this as a request for "reclassification," not promotion.